## Kentucky Home Mut. Life Ins. Co. v. Watts.

Oct. 31, 1944.

472

Woodward, Dawson & Hobson, L. H. Hilton, and Montgomery & Montgomery for appellant.

Moore & Pittman for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Reversing.

Appellee instituted the action against appellant to recover as beneficiary of an insurance policy on the life of his son. By the terms of the contract, appellant agreed, upon due proof of the death of the insured, to pay to the beneficiary the sum of One Thousand Dollars ($1,000), with double indemnity in the event of accidental death. The ordinary benefit feature of the policy contained a provision that, in the event of self-destruction within two years from the date of the policy, the liability of the Company would be limited to an amount equal to the premiums theretofore paid. The accidental feature of the policy exempted appellant from liability, should the insured's death occur from self-destruction. The exemption in the double indemnity feature was contained in the insuring clause; whereas the exemption in respect to the ordinary death feature was contained in a separate clause. The jury returned a verdict in favor of appellee in the sum of Two Thousand Dollars ($2,000); judgment was entered accordingly.

As grounds for reversal, appellant contends (1) the Trial Court erred in overruling appellant's motion for a peremptory instruction at the conclusion of the evidence for appellee; (2) the Trial Court erred in overruling appellant's motion for a peremptory instruction at the conclusion of all the evidence; (3) the Trial Court erred in overruling appellant's motion to be permitted to file an amended answer to conform to the proof; (4) the verdict of the jury was rendered under the influence of passion and prejudice; and (5) Instruction No. 1, given by the Court over the objection of appellant, was erroneous.

Consideration of the first two contentions requires a brief resume of the evidence. On April 18, 1942, three months and nineteen days after the policy became effective, the insured came to the home of his parents, which was momentarily occupied by his mother and sister. He stated to his mother that he wanted to borrow a gun to go squirrel hunting. She consented that he might use his father's shotgun, which was on a rack

above a bed in a room adjoining the kitchen. He asked his mother if she wanted a knife; and, upon being told that she did, gave her one. The mother testified that she had many times spoken of being in need of a knife to whittle kindling with which to build fires. The insured entered the room where the gun was kept; the mother and sister immediately heard the gun fire; they rushed into the room, and discovered the insured lying on his face on the floor, on top of the gun. They slipped the gun from under him and turned him on his back; he died in about an hour. The father was called to the house, and found the body and gun in the position last related. Appellee introduced evidence to the effect that the insured was in a happy frame of mind from the time he arrived at the house to the time he was shot. In support of appellant's contention that death was the result of suicide, it introduced evidence that the insured had been placed in Class 1-A by the local draft board on February 13, 1942, and had taken preliminary examinations for induction into the Army; that the insurance policy was issued at the solicitation of the insured; the agent of the Insurance Company did not explain to the insured the provisions of the policy in respect to suicide, but did explain its general provisions. That when the father of the insured heard that his son had "shot himself," he made the statement, "I bet a dollar he done it a-purpose." About a month and a half before his death, while "deviling" with Logue Smith, the deceased said that if he killed himself he would not have to go to the Army. That a long time before his death the deceased, in discussing the probability of going into the Army, stated "I will kill myself"; and then he laughed, and said "Well, I will let the Japs do that." The mother of the deceased was quoted by a witness as saying she did not know "what made her boy kill himself." Appellee told the acting Coroner that two or three weeks before the insured's death, he told appellee, "One thing, I will never go to the Army." He was likewise quoted by the witness as saying that he, appellee, had an uncle who committed suicide several years before. Another witness testified that appellee stated "he did not know what made the boy do it or shoot himself, unless over going to the Army." Appellant introduced in evidence a certified copy of the death certificate of the insured, the pertinent part of which is the answers to Questions 22 and 23, as follows:

"22. * * * The principal cause of death and related causes of importance in order of onset were as follows: *Gun shot self inflicted.* * * *

"23. If death was due to external causes (violence) fill in also the following: Accident, suicide, or homicide? *Suicide.* * * * "

No objection was made to any of the testimony related above. Because the insured's death occurred within two years from the issuance of the policy, appellee was entitled to recover either the double indemnity benefit, or nothing in excess of the premiums paid. Appellee sued for the double indemnity benefit; therefore, the burden of proof was upon him to show that the death of his insured resulted from bodily injuries effected directly, and independently of all other causes (including self-destruction), through external, violent, and accidental means. Prudential Insurance Co. of America v. Tuggle's Adm'r, 254 Ky. 814, 72 S. W. 2d 440; United Benefit Life Insurance Co. v. Schott, and companion case, 296 Ky. 789, 177 S. W. 2d 581, 150 A. L. R. 1359.

In the absence of evidence to the contrary, there is a presumption that a person possesses a love of life, and the instinct to preserve it. It follows, therefore, that there is a presumption, in law and in fact, against suicide or self-destruction on the part of a person who is sane. 31 C. J. S., Evidence, sec. 135, subsec. b pp. 773 and 774. But such presumption is prima facie only, and is rebuttable. Where the evidence shows facts or circumstances wholly inconsistent with the hypothesis of accidental death, and there is no room for any reasonable conclusion but that suicide occurred, not only does the presumption disappear entirely, but it is the duty of the Court to determine that death was caused by suicide and instruct the jury accordingly. But where the evidence is such that the jury may or may not infer suicide, it is the duty of the Court to submit the issue to the jury for its finding. The substantive evidence in respect to a design on the part of the insured to commit suicide was the relation of statements made by him several weeks prior to his death; and some of which, at least, were statements made in a jocular manner. Self-destruction is seldom contemplated by one in a happy frame of mind; and, when the contemplation extends over a long period of time, the person affected usually

becomes morose or despondent, and outwardly exhibits this frame of mind. On the morning the insured came to his death, he gave no outward exhibition that he contemplated taking his life; he was in his usual frame of mind, thoughtful of his mother, and expressed the desire to go squirrel hunting. It is true, he knew the gun he was about to handle usually was loaded. His brother, who last placed the gun on the rack, stated that he did not remember whether he left it cocked or not. The load from the gun struck the insured above the eyebrow; this place on his body was approximately on the same horizontal plane as was the rack on which the gun was resting. From these facts it was reasonable for the jury to infer that the gun fired accidentally when the insured removed it from the rack. The victim's previous statements were sufficient evidence pointing to suicide to submit the issue to the jury; but the evidence pointing to the contrary likewise was sufficient to submit the question of accidental death to the jury.

But it is argued that the presumption of suicide was overcome by the statement in the certificate of death that death occurred as the result of suicide under KRS 213.190, which provides that a certified copy of the death certificate shall be prima facie evidence in all courts and places of the facts therein stated; that, since the two presumptions offset each other, there is a mere scintilla of evidence of accidental death; and, since the burden of proving that death resulted through accidental means rested upon appellee, the latter did not introduce sufficient evidence to sustain the burden. This argument calls for a construction of the words of the Statute quoted above, and a review of a former decision of this court construing the Statute. It will be noted that the Statute provides that the certificate of death shall be prima facie evidence only of *facts* appearing in the certificate. Then, what are the facts appearing in the certificate to be given such great weight? Certainly, the Legislature did not mean that an opinion of the person making out the death certificate should be given any greater weight than the opinion of any other person, or even as great weight as the opinion of a person or group of persons who were in position to consider all the evidence in respect to the circumstances provable in a court of law. It is a matter of common knowledge that some death certificates are filled in and signed by coroners or attending physicians without investiga-

tion, or without any basis, other than mere suspicion, upon which to determine the manner in which the deceased arrived at his death. It is likewise a fact that coroners oftentimes fill out death certificates without holding an inquest; and it is almost invariably true that when an inquest is held, little evidence is introduced before the coroners' jury. That being true, the statement in the certificate that death was the result of suicide does not constitute a fact within the contemplation of the Legislature, but a mere opinion of one who likely did not have knowledge of all the circumstances surrounding the death. The fact concerning the cause of death in the certificate which was contemplated by the Legislature is the fact that the deceased came to his death by a gunshot wound, the words "self-inflicted" and "suicide" being mere expressions of the opinion of the person filling out the certificate. In Ætna Life Insurance Co. v. Milward, 118 Ky. 716, 82 S. W. 364, 366, 26 Ky. Law Rep. 589, 68 L. R. A. 285, 4 Ann. Cas. 1092, the verdict of a coroner's jury was offered in evidence. In discussing its admissibility, the Court said:

"We are of opinion that the record and the finding of the coroner's jury were irrelevant as evidence. While the coroner's inquest is a public function, made on behalf of the state, and while a record of it is required to be made and kept, it cannot, on any well-grounded principle of American common law, become evidence in another inquiry or suit as to the cause of the death investigated. The business of this tribunal is by statute to collect promptly the facts concerning deaths which the coroner has reason to believe were the result of crime. Like the grand jury, it projects an ex parte investigation of supposed or alleged crime resulting in homicide, for the purpose of aiding in the administration of the criminal laws of the state. The accused is neither represented, nor has the right to be, at the inquiry. For even better reasons, other persons who have property interests dependent upon the cause of the death would not be allowed to participate in the hearing before the coroner's jury, with a view to establishing rights by the verdict. That tribunal is unprovided with much of the necessary machinery for conducting such inquiries. It would, it seems to us, be abhorrent to the principles of the common law, as administered in this country, that one not so represented should be bound by the finding of the coroner's jury, his rights concluded without a

trial at which he could be heard—a trial 'behind his back,' as has been said. If such verdict be admissible as evidence, it follows from its very nature that it might alone constitute proof of the main fact, and of every essential fact in issue. It might, for example, not only show the fact of death by violent and external means within a date covered by the policy, but find also that it was accidental or was not accidental. In either event, a property right of one or the other of the litigants would be determined by a proceeding of which no notice was given to him, upon testimony not preserved, and may be wholly incompetent or insufficient, and without an opportunity to cross-examine the witnesses whose oaths established it  Thus he would be deprived of his property without 'a day in court,' for the first verdict might be enough, if the only evidence offered or obtainable, and the second one would be merely a formal ratification. If the verdict of the coroner's jury is not binding upon the world as a proceeding in rem, it could not be admitted as evidence on any other ground. It might be proof of the fact of the death of the person examined, and of the identity of the body. Further than that we are not prepared to admit it.''

That decision was rendered before the adoption by the General Assembly of the pertinent part of KRS 213.-190; nevertheless, it is helpful in an endeavor to properly construe the Statute, because it points out the distinction between the facts of death and identity, and the opinion as to the manner in which the death occurred. The certificate of death may have been prepared with the aid of the verdict of a coroner's jury, or may have been prepared without such assistance. In the one event, the verdict of suicide would be a mere opinion of the jury, which might not have had the advantage of hearing all the evidence in respect to that issue; in the other event, the conclusion of the person signing the certificate might be, as it was in this case, only an expression of his own opinion from a mere examination of the body when viewed. And so, under the Statute, the certificate of death is admissible for the purposes of evidencing the identity of the deceased and the fact that his death was caused by a gunshot wound, but is not admissible as evidence in respect to the issue of accidental death or suicide. We are cognizant of the fact that this Court has given a contrary construction to this provision of the Statute in the case of Prudential Insurance

Co. of America v. Ashley, 265 Ky. 281, 96 S. W. 2d 766. The soundness of the construction given the Statute in that case was questioned, but not determined, in a decision theretofore rendered by this Court. Prudential Insurance Co. of America v. Tuggle's Adm'r, supra. For the reasons stated above, we have concluded that the opinion in the Ashley case is erroneous, and should not be followed; and, to the extent of holding that the certificate of death is competent on the question of accidental death or suicide, it is overruled.

On the trial of the case, appellee testified that the insured had been suffering from a double hernia since birth. Appellant had not received this information previous to the trial. Accordingly, its attorneys prepared an amended answer, alleging that at the time of applying for the insurance the insured was ruptured, and that in the application he answered the question in respect to the existence of a rupture in the negative. The amendment further alleged that the answer was false, fraudulent, material to the risk, and the policy would not have been issued had appellant had knowledge of the true facts. The motion to be permitted to file the answer was supported by an affidavit of one of the attorneys, which showed that appellant did not have such information previous to the trial. The Court refused to permit the amendment to be filed. Section 134 of the Civil Code of Practice provides that the Court, in furtherance of justice, may at any time permit a pleading to be amended, by conforming the pleading to the facts proved, if the amendment does not change substantially the claim or defense. Section 136 of the Code provides that if a party amend a pleading, and the Court shall be satisfied that the adverse party cannot be ready for trial in consequence of the amendment, a continuance may be granted to enable the adverse party to prepare for the issue presented by the amended pleading. The amendment offered by appellant materially changed the defense; but the facts relied on in support of the amendment were not known to appellant until after the trial commenced. Section 134, especially when read in connection with Section 136, does not preclude the right of a party to a suit to amend his pleading upon discovery of facts theretofore unknown, simply because the amendment offered changes the defense or the cause of action. Where the defense is not changed by the amendment offered, it may be filed without necessitating

the continuance of the action; but where the amendment offered materially changes the defense or the cause of action, the adverse party shall be entitled to a continuance of the case, as a matter of right. In Board of Education of City of Ludlow v. Ritchie, 149 Ky. 674, 149 S. W. 985, an amendment was offered at the end of the preparation of the case which completely changed the defense. The Trial Court refused to permit the amendment to be filed; and this Court reversed the case, holding such refusal to be error. And so, we now hold that it was error of the Court to overrule appellant's motion to be permitted to file the amended answer tendered. On return of the case, the Court will permit the amendment to be filed.

Instruction No. 1 given by the Court is as follows:

"You will find for the plaintiff the sum of $2,000.00 with 6% interest from the 18th day of April, 1942, till paid unless you believe from the evidence that the deceased intentionally took his own life, that is, committed suicide, and if you so believe you will find for the defendant."

The instruction placed the burden of proof on appellant, defendant below; whereas, as heretofore indicated, the burden on the whole case was upon appellee. This was error, and prejudicial to the substantial rights of appellant. On the next trial, if the evidence shall be the same, the Court, in lieu of Instruction No. 1 as given on the first trial, will instruct the jury as follows:

"Instruction No. 1. If the jury shall believe from the evidence that the deceased, Virgil N. Watts, came to his death as the result of bodily injuries effected directly, and independently of all other causes, through external, violent, and accidental means, then you shall find for the plaintiff in the sum of Two Thousand Dollars ($2,000.00), with interest thereon at the rate of six per centum (6%) per annum from April 18, 1942, but unless you so believe, or if you believe as set out in instruction No. 2, you will find for the plaintiff in the sum of $——, the amount of the premiums on the policy sued on herein which had been paid to and received by the defendant, and no more.

"Instruction No. 2. If the jury shall believe from the evidence that the deceased, Virgil N. Watts, intentionally took his own life by shooting himself with a shot-

gun, they will find for the plaintiff in the sum of $——, the amount of the premiums on the policy sued on herein which had been paid to and received by the defendant, and no more.''

Since the evidence would not support a contention that the insured, if he did commit suicide, was so bereft of mind as to not know or comprehend the consequences of his act, we have eliminated this question from the consideration of the jury. Should the evidence on the second trial present this issue, it will be the duty of the Court to instruct upon it.

Since, for the reasons set out above, the judgment must be reversed, it is unnecessary for us to determine whether the verdict was rendered under the influence of passion and prejudice.

Judgment reversed.

Whole Court sitting.